UNITED STATES of America, Appellee,

v.

Jonathan WAGNER, Daniel Hernandez, Richard Moreno, Defendants–Appellants.

No. 02–1287(L), 02–1288(CON), 02–1507(CON).

United States Court of Appeals, Second Circuit.

June 15, 2004.

Marc Fernich, Law Office of Marc Fernich, New York, New York, for Appellant Wagner.

Philip Katowitz, Brooklyn, New York, for Appellant Hernandez.

Barry Gene Rhodes, Brooklyn, New York, for Appellant Moreno.

Christina Dugger, Assistant United States Attorney for the Eastern District of New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, on the brief; Susan Corkery, Assistant United States Attorney for the Eastern District of New York), Brooklyn, New York, for Appellee, of counsel.

PRESENT: KEARSE, SOTOMAYOR, Circuit Judges, and SWAIN, District Judge.*

## SUMMARY ORDER

Defendants-appellants Jonathan Wagner, Daniel Hernandez, and Richard Moreno, in connection with their participation in the affairs of the "Woodbine Crew," a group based in the Bushwick section of Brooklyn, were convicted, following a five-week jury trial, of conducting and conspiring to conduct a racketeering enterprise, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

---

* The Honorable Laura Taylor Swain, of the United States District Court for the Southern District of New York, sitting by designation.

18 U.S.C. §§ 1962(c) & (d), and various counts of robbery and conspiracy to rob, in violation of the Hobbs Act, 18 U.S.C. § 1951. Wagner and Hernandez also were convicted of conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. The district court sentenced Wagner and Hernandez principally to concurrent terms of life imprisonment, and Moreno principally to a 315–month prison term to run concurrently with a 75–year state sentence imposed previously for armed robbery. On appeal, defendants challenge the sufficiency of the evidence supporting certain of their convictions and several pretrial and trial rulings made by the district court. Wagner and Hernandez also challenge their sentences.

### 1. Sufficiency–of–the–Evidence Challenges

Sufficiency-of-the-evidence challenges will be rejected "if, after viewing the evidence in the light most favorable to the prosecution, the ... court finds that *any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt*." *United States v. Coonan*, 938 F.2d 1553, 1559 (2d Cir.1991) (emphasis in original; citation and internal quotation marks omitted). All reasonable inferences from the evidence presented at trial must be drawn in favor of the Government. *Id.*

▇ First, Wagner argues[1] that the Government failed to prove the existence of a RICO enterprise because, he maintains, it presented *no* evidence of an enterprise distinct from the alleged predicate acts, and, further, the predicate acts alleged were nothing more than a discontinuous series of individual crimes. Neither of these arguments has merit. Contrary to Wagner's first argument, neither the Supreme Court nor this Court has required that the Government's proof of the alleged enterprise be distinct from the racketeering conduct. *See, e.g., United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (holding that while both the "enterprise" and "pattern of racketeering" elements must each be proven, "the proof used to establish these separate elements may in particular cases coalesce"); *United States v. Indelicato*, 865 F.2d 1370, 1383–84 (2d Cir.1989) (*en banc*) ("[T]he difference in the nature of the [pattern and enterprise] elements does not mean that the same piece of evidence may not help to establish both."). Even assuming *arguendo* that distinct proof were required, our review of the record shows that the Government offered evidence beyond the charged predicate acts to prove the existence of the enterprise, such as evidence concerning the Crew's genesis, its leadership, and tools contributed by Crew members and shared to accomplish the Crew's goals. Concerning Wagner's second contention, the evidence shows that the activities of the Crew, drug dealing and committing robberies, established a connected pattern of the defendants' use of criminal activity to make money. While some of the robberies were committed in part to support the drug dealing, ultimately both were done to make money for the enterprise.

▇ Second, Moreno challenges the sufficiency of the evidence concerning his RICO convictions because, he asserts, the Government's evidence concerning his role in the enterprise was limited to certain robberies that did not affect interstate commerce. Moreno contends that "he can-

---

1. Moreno and Wagner join in the arguments of their codefendants pursuant to Fed. R.App.

P. 28(i).

not be held accountable for racketeering when the interstate effect of the enterprise's activities had nothing to do with his own behavior." This argument is unavailing, however, because under RICO only the activities of the *enterprise*, rather than the activities of any one particular actor, must affect interstate commerce. *See* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with *any enterprise engaged in, or the activities of which affect, interstate or foreign commerce*, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." (emphasis added)). Further, the definition of "racketeering activity" does not impose a requirement that the illicit act affect interstate commerce. *See* 18 U.S.C. § 1961(1)(A) (defining racketeering activity to include "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year"). Because an interstate nexus requirement is not an element of any one of the predicate acts here chargeable under New York law, *see* New York Penal Law §§ 160.15, 105.10, 20.00, the government was not required to put forth any evidence of such. In any event, the evidence showed that Moreno was involved in at least two robberies or robbery conspiracies—the conspiracy to rob "Everlast" and the robbery of Vasilios Lazarides—that were connected to the narcotics enterprise and therefore linked to interstate commerce. *See United States v. Vasquez*, 267 F.3d 79, 90 (2d Cir.2001) ("Engaging in narcotics trafficking affects *interstate* commerce, at the very least, regardless of where the raw materials originate." (emphasis in original)).

■ Third, Hernandez and Moreno challenge the sufficiency of the evidence concerning their involvement in three predicate RICO acts. These challenges are unavailing. Hernandez and Moreno first contend the evidence was insufficient to prove their involvement in a conspiracy to rob Everlast because, they contend, the agreement never ripened into an overt act as required under New York state law. We reject this challenge because there was sufficient evidence to prove that the discussions had moved beyond the "cementing of the agreement itself," and into the planning stage, which included the sharing of intelligence, delegation of duties, and instruction on obtaining "the implements of the crime." *People v. Menache*, 98 A.D.2d 335, 337–38, 470 N.Y.S.2d 171 (2d Dep't 1983). Specifically, Hernandez had obtained the whereabouts of Everlast; Hernandez told Sanchez to obtain a police-type vehicle for the robbery; Hernandez, Moreno and Sanchez discussed how to catch Everlast off guard and threaten him and his wife with death; and Hernandez determined and instructed the others that the day of the robbery would be Sunday, March 28, 1999. Thus, the conversations had evolved into discussions of the mechanics of the robbery and the delegation of acts in furtherance of it, thereby satisfying the overt act requirement under New York law.

■ Next, Hernandez argues that the Government did not prove that the robbery of John Romero was connected to the RICO enterprise. The record evidence shows, however, that a rational juror could have concluded that the robbery was connected. Romero was a rival drug dealer, whom Hernandez robbed when Romero and Silva, another rival drug dealer, were

engaging in a drug deal with customers from New Jersey, the origin of several of the Woodbine Crew's customers. Hernandez and others in the Crew applied tactics used in other robberies of drug dealers, such as in the Gilberto Estrada robbery and as planned for the Everlast robbery: they pretended to be police. Although Hernandez claims that the robbery was to recover a debt owed by Romero to Hernandez's uncle, the egregiousness of the robbery and wounds inflicted upon Romero were disproportionate to the amount owed (approximately $1,000). Additionally, the robbery was not just of Romero; Silva was also robbed.

■ Further, Moreno claims that the evidence was insufficient to prove his involvement in the robbery of Vasilios Lazarides because no witness identified him as having participated. He cites the inconsistent verdicts[2] as support for his insufficiency-of-the-evidence claim. First, the inconsistent verdicts rendered concerning the Lazarides robbery are not a ground for granting a sufficiency-of-the-evidence challenge. *See United States v. Powell*, 469 U.S. 57, 65–66, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). Second, having reviewed the evidence, we find his argument unavailing. Lazarides's wife, who was present outside of the apartment building the day that Lazarides was robbed, provided a highly detailed description of Moreno's race, gait and height. Her description was corroborated by the testimony of Lazarides, testimony describing similar features of other robberies, and Moreno's physical appearance and prosthetic leg. Thus, the evidence was sufficient to permit a rational juror to conclude that Moreno

was involved in the robbery of Lazarides. *See Coonan*, 938 F.2d at 1559.

■ Fourth, Hernandez and Moreno raise two sufficiency-of-the-evidence challenges regarding their convictions under the Hobbs Act for conducting and conspiring to engage in robberies. Hernandez and Moreno contend that the evidence concerning the conspiracy to rob, and the robberies of, Ara Hagopian and Mary Macchioni was legally insufficient because the Government failed to prove a nexus to interstate commerce. Evidence at the trial, however, showed that Hagopian and Macchioni were targeted specifically because of their ownership and management of a catering hall that was engaged in interstate commerce, and that the cash proceeds stolen from Hagopian were generated by and for use in connection with the operation of the catering hall. Such a connection is sufficient to establish the interstate nexus element of the offense. *Cf. United States v. Wilkerson*, 361 F.3d 717, 730–31 (2d Cir.2004) (affirming attempted robbery conviction where defendants conspired to rob the victims' landscaping business, which purchased supplies from an in-state retailer that obtained its goods from out-of-state wholesalers, and where the theft, had it been accomplished, would have deprived the business of monies to be used to purchase goods that traveled in interstate commerce).

■ Next, Hernandez argues that the government failed to prove an interstate nexus with respect to the Everlast robbery conspiracy. A conspiracy conviction under the Hobbs Act need be supported only by evidence of a potential, and not an actual, effect on interstate commerce, however.

---

**2.** The jury found that the government had not proven, as a predicate act under the RICO conduct charge, that Moreno was involved in the conspiracy to rob, or actual robbery of, Lazarides. As a predicate act under the

RICO conspiracy charge, however, the jury found that the government had proven that Moreno was involved in the actual robbery of Lazarides.

*United States v. Shareef,* 190 F.3d 71, 75 (2d Cir.1999). Here, the government presented evidence that Hernandez intended to rob Everlast, a narcotics dealer, of his substantial narcotics trafficking proceeds. Narcotics trafficking affects interstate commerce. *See* Controlled Substances Act, 21 U.S.C. § 801(3)(B); *Vasquez,* 267 F.3d at 90. Consequently, this claim is unavailing.

▆ Finally, Hernandez argues that the "evidence of [his] involvement in the charged narcotics conspiracy falls short of what is required." We reject this contention based on our review of the record. Testimony was presented that Hernandez was involved in the drug conspiracy since the initial merger with Carlos "Charlie" Villanueva. In November of 1992, Hernandez and other crew members violently robbed Elvin Sanchez to "enhance [Hernandez's drug] business." Moreover, a witness testified that he saw Hernandez with another crew member who was passing out samples of "Gotta Have It" heroin in front of a rival drug dealer's drug spots. That testimony was corroborated by another witness who testified that he saw Hernandez handing out samples of heroin on four or five occasions during the period from 1993 to 1995. Gabriel "Bobby" Rodriguez also testified that after the agreement with Villanueva was made, Rodriguez often saw Hernandez, Wagner and some heroin customers when he picked up "Gotta Have It" heroin. Moreover, testimony was received regarding Hernandez's delivery of brown paper bags to Villanueva's sister Bernice while complaining about Villanueva's treating people like "kids." This evidence, when viewed in the light most favorable to the Government and together with other evidence that paper bags were used to make payments, supports the inference of Hernandez's involvement in the narcotics conspiracy. Finally, the evidence was sufficient to permit the jury to find that Hernandez's participation in the violent robberies of Romero, delinquent on a drug debt, and Sanchez, a rival drug dealer, served to increase Hernandez's reputation in the drug community, to collect on monies owed, or to strengthen the narcotics business. On this evidence, a rational juror could have found Hernandez's participation in the narcotics conspiracy proven beyond a reasonable doubt. *See Coonan,* 938 F.2d at 1559.

*2. Challenges to Pretrial Rulings*

Hernandez contends that he is entitled to a new trial because of two erroneous pretrial rulings made by the district court. We review challenges concerning the admission of evidence for abuse of discretion, *see United States v. Jones,* 299 F.3d 103, 112 (2d Cir.2002), the trial court's findings of fact for clear error, and its conclusions of law *de novo, see Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.Y.,* 362 F.3d 33, 40 (2d Cir.2004).

First, Hernandez argues that the evidence of the pretrial identifications made by Sanchez, Romero and Rodriguez should have been suppressed because the photo arrays and spreads used in those identifications were unduly suggestive. "Identification evidence must be suppressed if the display was so unnecessarily suggestive and conductive to irreparable mistaken identification that [the defendant] was denied due process of law." *United States v. Jakobetz,* 955 F.2d 786, 803 (2d Cir.1992) (internal quotation marks omitted). It is worth noting that Hernandez was identified not just by Sanchez, Romero, and Rodriguez, but also by two people who already knew him—Prosper and Lopez. We conclude that the district court's factual findings that the photo arrays and photo spread book were not suggestive or conducive to mistaken identification were not in error. The district court therefore did not abuse its discretion in admitting testimony concerning the identifications.

■ Last, Hernandez asserts that several defects were present in the search warrant and resulting search of his apartment, and thus that the items recovered during the search should have been excluded at trial. Specifically, he argues that the affidavit in support of the warrant did not show probable cause, that the warrant was facially deficient, and that the items seized exceeded the scope of the warrant. We reject each of these contentions. The application for the search warrant sufficiently articulated grounds for probable cause because it stated that Hernandez had firearms in his apartment and that he was planning to engage in a violent robbery of a drug dealer to be committed the following day. The government also provided evidence of the reliability of the confidential informants. Further, the warrant contained an adequate description of the premises, such that "the officer[ ] armed with [the] search warrant [could] with reasonable effort ascertain and identify the place intended," *Velardi v. Walsh*, 40 F.3d 569, 576 (2d Cir.1994) (citations and internal quotation marks omitted), and, although the warrant misidentified the actual number on the apartment, that fact alone does not invalidate the warrant where the warrant described the premises as known after reasonable investigation, *see Maryland v. Garrison*, 480 U.S. 79, 85, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). Finally, the items seized and admitted into evidence fell within either the scope of the warrant or the plain view doctrine. *See United States v. $557,933.89, More or Less, In U.S. Funds*, 287 F.3d 66, 81–82 (2d Cir.2002).

### 3. Challenges to Trial Rulings

Defendants argue that a new trial is warranted based on several assertedly erroneous rulings made at trial.

■ First, defendants challenge the district court's refusal to permit them to attack the credibility of Sanchez, a government cooperator, with taped conversations between Sanchez and his sister. Sanchez, however, did not testify at trial, and the district court explicitly instructed the jury that the statements of Sanchez contained in other tape recordings between Sanchez and defendants entered into evidence were not admitted for their truth, but for the context of defendants' statements contained therein. Because the admitted statements were not hearsay, Sanchez's credibility was irrelevant, and Rule 806 of the Federal Rules of Evidence therefore did not apply. *See* Fed.R.Evid. 806 (permitting impeachment of declarant when hearsay statement admitted in evidence); *United States v. McGowan*, 58 F.3d 8, 15–16 (2d Cir.1995).

■ Second, Wagner and Hernandez contend that the district court should have provided a missing witness charge as to Sanchez. Given all the attendant facts and circumstances, however, we conclude that it was well within the district court's discretion to refuse such a request. *See United States v. Rollins*, 487 F.2d 409, 412 (2d Cir.1973) (holding that, in considering witness availability, court should review "all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility"). Defense counsel requested the charge only after closing its case, on the ground that Sanchez's attorney had not returned counsel's phone call. The court noted that counsel had failed to make an application to interview Sanchez and invited counsel to call Sanchez as a witness, which invitation counsel declined. The court also permitted counsel to argue that an adverse inference could be drawn from Sanchez's absence. Under these circumstances, the trial court acted well within its discretion. *See United States v. Torres*, 845 F.2d 1165, 1170–71 (2d Cir. 1988).

Third, Hernandez and Moreno argue that they should have been permitted to cross-examine Leslie Prosper concerning the identities of the victims involved in Prosper's rape, sodomy and witness-intimidation convictions. Although the particular information may have been somewhat relevant to Prosper's credibility, we conclude that the questions asked and observations made by Judge Raggi were pertinent to an analysis under Rule 403 of the Federal Rules of Evidence, and find that her decision to deny admission of these victims' identities was not an abuse of discretion.

Fourth, Wagner claims that much of the evidence supporting the RICO charges was admitted improperly as a result of "faulty RICO charges" and a joint trial, thereby causing an unfairly prejudicial spillover effect. This argument is unavailing, however, because the evidence was sufficient to affirm the RICO convictions. Further, the evidence against Wagner, who was involved in drug dealing and some of the most brutal of the robberies, was not, as Wagner asserts, "significantly [less] arousing" than, or "qualitatively different from," the evidence implicating his codefendants.

### 4. Sentencing Challenges

Wagner and Hernandez challenge certain decisions made by the district court in sentencing them. First, Wagner argues that the district court improperly enhanced his base sentencing level by a four-point leadership role adjustment under U.S.S.G. § 3B1.1. This claim is unavailing. Prior to imposing an offense-role enhancement, the sentencing court must make factual findings "that the defendant was 'an organizer or leader,' and ... that the criminal activity either involved five or more participants or was otherwise extensive." *United States v. Zagari,* 111 F.3d 307, 330 (2d Cir.1997) (internal quotation marks omitted). At the sentencing hearing,

Judge Raggi found that "[Wagner] was the leader of this crew ... I have to say that I was left at trial with absolutely no question that the heroin dealing of the Woodbine crew was entirely under the supervisio[n] of Mr. Wagner." Based on our review of the record, we conclude that these factual findings were well supported and thus find no error in the sentencing court's leadership role adjustment. The fact, as Wagner maintains, that Villanueva and others also may have been leaders does not displace Wagner's proven leadership role.

Second, Hernandez argues that the district court erred in determining the quantity of drugs for which he was accountable without first holding a hearing pursuant to *United States v. Fatico,* 579 F.2d 707 (2d Cir.1978). This argument is meritless. When disputes arise concerning factual matters important to the sentencing determination, the "procedures to be adopted for resolution of such disputes lie within the sound discretion of the sentencing judge." *United States v. Berndt,* 127 F.3d 251, 257 (2d Cir.1997). Further, when a district court for sentencing purposes estimates the amount of drugs involved in a crime in the absence of a drug seizure, that estimate need only be established by a preponderance of the evidence. *See United States v. Prince,* 110 F.3d 921, 925 (2d Cir.1997). The district court in estimating that amount may rely on any information available to it, including evidence that would not be admissible at trial, *see* U.S.S.G. § 6A1.3(a) (1998), so long as it relies on "specific evidence—*e.g.,* drug records, admissions or live testimony." *United States v. Shonubi,* 103 F.3d 1085, 1089 (2d Cir.1997) (emphasis and internal quotation marks omitted). The district court properly reviewed the evidence presented at trial in making its quantity estimation. Further, the court did not abuse its discretion in denying defense counsel's request for a hearing. When the district court prompted defense counsel to specify ques-

tions that would be explored at the requested hearing, counsel raised questions, with but one exception, concerning only guilt and not drug quantity. Thus, the court acted well within its discretion in denying the request for a hearing.

We have reviewed defendants' remaining arguments on appeal and find them meritless.

For these reasons, the judgment of the district court is AFFIRMED.